**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIM. NO. 04-30046-MAP** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALBERT INNARELLI, ET AL.** | ) | |
| **Defendants.** | ) | **JULY 28, 2006** |

## DEFENDANTS'[1] MEMORANDUM OF LAW RE: APPROPRIATE METHODOLOGY FOR CALCULATING LOSS

Pursuant to the Court's order, the defendants referenced in footnote 1 herein, join together to submit this memorandum in support of the appropriate proposed method for determining "loss."

The November 1, 2001 Sentencing Guidelines are applicable in this case because the offense conduct ended prior to November 1, 2002, and versions of the Guidelines subsequent to the 2001 publication contain changes that are detrimental to the defendants. The defendants have joined in their determination that the following law and methodology are applicable.

### I.    Background

The thirteen defendants were charged in a 69 count superseding indictment, with wire fraud (counts 1-68), in violation of 18 U.S.C. §§ 1343 and 2, and one count of conspiracy to

---

[1] The following defendants have joined in this Memorandum of Law: Albert Innarelli, Michael Bergdoll, Anthony Matos, Pasquale Romeo, Wilfred Changasie, Mark McCarthy, James Smith, and Lawrence Lynch.

launder money (count 69), in violation of 18 U.S.C. §§ 1956(h). Each of the defendants has entered guilty pleas to various counts of the superseding indictment.

The Government has alleged that the scheme involved investors buying real estate at auction and reselling the properties at higher prices, often quickly, to new buyers. According to the indictment, the object of the scheme was to obtain money from lending institutions by fraudulent means. The program required the involvement of a lawyer, investors, assessors, mortgage brokers and buyers. A new buyer would secure a purchase and sale agreement with the aid of an attorney, and then go to a mortgage broker with the purchase and sale agreement and an independent property assessment. Armed with these documents, a mortgage broker would then secure the loan from a lending institution. Some purchase and sale agreements and related documents contained false information, including inflated assessments.

There are 68 properties listed as involved in the wire fraud offense, and 28 additional properties listed in the money laundering offense. Most, if not all, of these properties were purchased at distressed sales. The defendants will present evidence that prices paid at such sales are known to be less than the true fair market value of the properties. Transactions at distressed auctions do not occur in the normal purchase and sale context, therefore, they do not reflect the true fair market value of the properties. The reason prices at distress auction are below fair market value is that the seller, usually a mortgage holder, is not a homeowner and does not wish to be in the real estate business. Mortgage holders have sound economic

2

Case 3:04-cr-30046-MAP    Document 227    Filed 07/28/2006    Page 3 of 21

reasons to sell the property. These transactions do not take place in the context of a

homeowner selling the property.

The Sentencing Guidelines, although now advisory, must nonetheless be considered

by the Court as part of the sentencing process. In this case, the appropriate guideline is

§ 2B1.1. The commentary to § 2B1.1 provides:

> The Commission has determined that, ordinarily, the sentences of defendants
> convicted of federal offenses should reflect the nature and magnitude of the loss
> caused or intended by their crimes. Accordingly, along with other relevant factors
> under the guidelines, loss serves as a measure of the seriousness of the offense and the
> defendant's relative culpability and is a principal factor in determining the offense
> level under this guideline.

Since the Commission considers loss as a proxy for culpability in economic crime cases, the

determination of the amount of loss in the instant case will affect each defendant.

## II.     DETERMINATION OF LOSS

The Government bears the burden of proving aggravating factors in any case. In this

case, the Government must prove the amount of loss. From the Government's current

expressions on this subject, it appears they are not submitting a detailed analysis that would

prove loss. When it became apparent that the Government's position on loss was simply to

assert that it consisted of the total amount of money issued by the lending institutions,

notwithstanding the absence of any law to support such assertion, the defendants realized the

Court would need a more studied analysis. The Government's position in this case violates

the policy statements and principles of the Sentencing Guidelines, as well as established case

law, despite the Department of Justice's official position that a reasonable sentence is one that

complies with the Guidelines.

3

Case 3:04-cr-30046-MAP    Document 227    Filed 07/28/2006    Page 4 of 21

### A.    The Lending Institutions Are The Only Victims In This Matter

Section 2B1.1 defines a "victim" as a person or entity that suffered "any part of the actual loss." In the instant case, there is no dispute that the lending institutions should be classified as putative victims. They are, however, the only victims in this case. Despite the Government's suggestion otherwise, the buyers in this case are **not** victims. Most, if not all, of them were involved in the charged conduct.[2] Complicity of buyers in schemes similar to the one at hand, has been recognized by the First Circuit Court of Appeals as an appropriate ground for downward departure. See United States v. Rostoff, 53 F.3d 398, 405 (1ˢᵗ Cir. 1995) (defendant condominium developers, misrepresented buyers' downpayments to bank; in formulating downward departure, District Court noted that one factor contributing to magnitude of loss was buyers' role and characterized them as "neither dupes nor victims in the traditional sense... they had become willing participants in the defendants' scheme"; First Circuit Court of Appeals agreed that "the buyers' complicity" contributed to magnitude of loss).

Many of the Innarelli buyers, like those in Rostoff, were complicit in the program. Equally important, most were in no position to be securing mortgages on the properties charged in the indictment. Generally, the buyers benefited from the loans, and had they not participated in the deception, there would be no offense.

---

[2] The defendants aver that persons involved in assisting the perpetration of the offense cannot be identified as victims. Indeed, the Government has already prosecuted one such "victim." See United States v Hutchison, CR 03-30017-MAP.

4

## B.    Intended Loss Is Actual Loss In This Case

As stated previously, § 2B1.1 of the Federal Sentencing Guidelines (2001) applies to

the instant offense. Specifically, application note 2(A) of § 2B1.1, defines loss as "the

greater of actual loss or intended loss." Intended loss is the "pecuniary harm that was

intended to result from the offense." U.S.S.G. § 2B1.1, n.(A)(ii). Recently, the First Circuit

Court of Appeals clarified its interpretation of "intended loss":

> The guidelines at § 2B1.1 define intended loss as 'the pecuniary harm that was
> intended to result from the offense, [including] intended pecuniary harm that would
> have been impossible or unlikely to occur.' The Government bears the burden of
> proving intended loss by a preponderance of the evidence... This circuit has not
> previously decided whether reasonably foreseeable loss qualifies as intended loss, and
> the approaches taken by other circuits vary...
>
> For our part, we think it sensible... to follow the common-law rule that a person is
> presumed to have generally intended the natural and probable consequences of his or
> her actions. See, e.g., U.S. v. Jacobs, 117 F.3d 82, 95 (2d Cir 1997); cf. U.S. v.
> Fortier, 242 F.3d 1224, 1232-1233, cert. denied, 534 U.S. 979 (10th Cir. 2001)
> (endorsing an increased sentence under the guidelines for harms that were a
> reasonably foreseeable consequence of, although not directly caused by, a defendant's
> conduct). Thus, in cases like the present one where the defendant's criminal role was
> to convey stolen credit cards to someone else, **'intended loss' includes 'losses that
> might naturally and probably flow from' his unlawful conduct.** Jacobs, 117 F.3d
> at 95.

(Internal citations omitted.) (Emphasis added.) United States v. Alli, 444 F.3d 34, 38 (1st Cir.

2006). The First Circuit Court of Appeals' definition of intended loss is consistent with the

defendants' position that any loss sustained by the lending institutions would be such a loss as

flowed naturally from the offense. Thus, in the instant case, intended loss encompasses

actual loss.

5

Case 3:04-cr-30046-MAP    Document 227    Filed 07/28/2006    Page 6 of 21

United States v. Gonzalez-Alvarez, 277 F.3d 73 (1ˢᵗ Cir. 2002), also aids in illuminating the defendant's position that intended loss and actual loss are one in the same. In United States v. Gonzalez-Alvarez, the defendant, Mr. Gonzalez-Alvarez, was a licensed-dairy farmer who conspired with co-defendants to adulterate milk with water and salt in order to increase volume and profits. Gonzalez-Alvarez, 277 F.3d 73. In assessing loss, the First Circuit Court of Appeals noted that the value of the adulterated milk was zero because, as the Government contended, the adulterated milk could not lawfully be distributed in interstate commerce and was subject to seizure. Gonzalez-Alvarez, 277 F.3d at 78. The First Circuit Court of Appeals endorsed the Government's argument and held "that where a product cannot be sold lawfully it has a value of zero for the purpose of calculating loss under U.S.S.G. § 2F1.1(b)(1). Id. The value of the milk is the same whether we apply actual loss or intended loss." Id.

Unlike Gonzalez-Alvarez, the facts of the case at bar demonstrate that all properties purchased with the loans **did** and **still** do maintain value. Applying the principles of Alli and Gonzalez-Alvarez to the instant case, the lawyer, investors, assessors, mortgage brokers, and buyers are presumed to have reasonably foreseen the natural and probable consequences of their actions, **including when their actions caused no loss.** For instance, in cases where buyers/homeowners intended to perform and are currently paying their mortgages, there is no actual loss.

In other cases, where properties were forfeited after buyers/homeowners defaulted, lenders may or may not have lost money on foreclosure of the property. The most logical

and realistic way to assess the "loss" in this case is to treat it as a fraudulent loan application case, where "loss" is based on the amount the lender actually lost.

In support of treating this case as a fraudulent loan application case and using actual loss as the measure, it is noteworthy that the 2001 amendments to the Guidelines combined § 2F1.1 with § 2B1.1 and created new definitions for loss; however, some policy statements and earlier case law remain essentially unchanged by the new format. The policy of § 2F1.1, note 8(b) (2000), clarifies that in a loan application case involving misrepresentation of assets, "if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (**or can expect to recover**) from any assets pledged to secure the loan."[3]

Application note 8(b) to § 2F1.1, has been renamed § 2B1.1, note (E)(i)(ii), but remains, in essence, the same standard for loss in fraudulent loan application cases. Amendment 617 to the new fraud guideline provides explanation for the amendment:

---

[3] See United States v. Brandon, 17 F.3d 409, cert. denied, 513 U.S. 820 (1st Cir. 1994) (defendants were involved in a scheme to obtain bank loans by fraudulently representing the existence of down payments, District Court reduced the amount of loss caused by the fraud by the amount of the collateral securing the loans); see also United States v. Chichy, 1 F.3d 1501, cert. denied, 510 U.S. 1019 (6th Cir. 1993) (defendants assisted clients in submitting fraudulent loan applications in order to obtain FHA insured mortgage loans, Sixth Circuit Court of Appeals held that under the November 1991 amendment to application note 7 of § 2F1.1, defendant's offense level should have been based on the actual or expected loss to HUD-FHA, rather than the total mortgage proceeds of all the loans in the conspiracy count; District Court's error was harmless, however, because the judge anticipated the note's rationale and departed downward based on what he considered to be the estimated actual loss, District Court's loss calculation was a reasonable estimate of the actual loss).

> The loss definition also provides for the exclusion from loss of certain economic
> benefits transferred to the victims, to be measured at the time of detection. This
> provision codifies the "net loss" approach that has developed in the case law, with
> some modifications made for policy reasons. The crediting approach is adopted
> because the seriousness of the offense and culpability of a defendant is better
> determined by using a net approach. This approach recognizes that the offender who
> transfers something of value to the victim(s) generally is committing a less serious
> offense than an offender who does not.

U.S.S.C. Append. C amend. 617. Under the 2001 Guidelines, § 2B1.1 (E) provides that **loss**

**shall be reduced by the following**:

> (i)    The money returned, and the fair market value of the property returned
>        and the services rendered, by the defendant or other persons acting
>        jointly with the defendant, to the victim before the offense was
>        detected. The time of detection of the offense is the earlier of (I) the
>        time the offense was discovered by a victim or Government agency; or
>        (II) the time the defendant knew of reasonably should have known that
>        the offense was detected or about to be detected by a victim or
>        Government agency.
>
> (ii)   **In a case involving collateral pledged** or otherwise provided by the
>        defendant, **the amount the victim has recovered** at the time of
>        sentencing from disposition of the collateral, or **if the collateral has
>        not been disposed of by that time, the fair market value of the
>        collateral** at the time of sentencing.

(Emphasis added). Here, the appropriate application is § 2B1.1, note (E)(ii). This approach

provides a logical and realistic determination of putative loss suffered by the lending

institutions and contemplates consideration of a host of variables that actually impact "actual

loss." Under § 2B1.1, note (E)(ii), the Court would have to consider what the defendants

could have reasonably foreseen, including the income that lenders would earn from the

origination of the loans. For example, income earned by lenders as the result of interest

earned, lender fees at closing, prepayment penalties, and their portion of the credit life

insurance premium the lenders actually received from the life insurance company, were

reasonably foreseeable and actual credits against any potential loss.

An appropriate analysis of the putative "loss" begins with the analysis of the different

categories of the loans involved. Essentially, there are four categories: (1) Loans that are

still earning; (2) Loans that have discharged mortgages; (3) Loans that had been foreclosed

where the foreclosure was the final sale; and (4) Loans that were foreclosed by the lender and

resold later to another party.

(1)     Earning Loans

Earning loans are those where the buyers have continued to meet their mortgage

obligations. Earning loans have no loss and they certainly do not contribute to any loss. In

fact, the lenders in this category of loans would have earned substantial income considering

the interest earned on each monthly payment and the substantial lender closing fees.[4]

(2)     Discharged Mortgages

Mortgage discharges occur when the loan is paid off. This is usually due to a sale of

the property by the borrower, or as a result of the borrower refinancing with another lender.

The lender then discharges the mortgage obligation. No further loss can be associated with

these mortgages.

(3)     Loans Sold at Foreclosure

---

[4] These are fees collected by the lender at closing for such items as underwriting fees,
processing fees, document preparation fees, commitment fees, points, credit life insurance,
etc.

9

Case 3:04-cr-30046-MAP    Document 227    Filed 07/28/2006    Page 10 of 21

The lender forecloses on a loan due to a non-payment at some point. The property is sold by the lender at a foreclosure sale. Loss on the sale of foreclosure loans is calculated using the principal balance amortized through the date the borrower stopped making payments, together with specific consideration of the other income variables discussed above.

(4)    Loans Sold after Foreclosure

If the lender does not sell properties associated with a mortgage at a foreclosure sale, the lender holds the properties and sells them at a later date. Loss on the sale of foreclosure loans is calculated using the principal balance amortized through the date the borrower stopped making payments, together with the other income specified above.

Any potential loss in this case can be calculated with specificity, given the voluminous information available with respect to each of the relevant loans. Not disputed at this juncture, is the operation of the program over time, basic roles of the various defendants and other parties to the transactions, and the financial details with respect to the relevant files. A thorough and accurate breakdown of all of the relevant loans will permit an accurate calculation of loss as required under the Guidelines and case law.

III.    **ASSIGNING LOSS TO INDIVIDUAL DEFENDANTS**

As even the Government recognizes, loss amounts should be assigned on an individual basis to each of the thirteen defendants pursuant to § 1B1.3 addressing relevant conduct. Application Note 2 of § 1B1.3 advises that, "the scope of the criminal activity jointly undertaken by the defendant ...is not necessarily the same as the scope for the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."

10

This memorandum does not purport to assign loss to each defendant. The Court is in the best position to find and apply the facts to each defendant. On the other hand, a detailed analysis of the relevant loans can be applied separately with respect to each defendant, according to their role. This allows the Court to attribute to each defendant the full allocable calculation of loss for their individual conduct.

Simply stated, § 1B1.3(A) makes a defendant accountable for the defendant's own conduct ("acts and omissions") and, in certain circumstances, for the conduct of others; for the harm that results from that conduct; and for "any other information specified in the applicable guideline." The defendants understand that they are accountable for all acts, whether charged, or charged and dismissed, that are part of the same course of conduct or common scheme as the count(s) of conviction. The defendants also understand that because this case involves thirteen defendants, that each defendant may also be accountable for reasonably foreseeable acts and omissions of others that furthered the jointly undertaken criminal activity.

### A.    Acts of Others

Determining the defendant's own conduct under § 1B1.3(a)(1)(A) is a fairly straightforward operation. But what does § 1B1.3(a)(1)(B) mean when it states that the defendant is also responsible for the acts of others in a jointly undertaken activity?

Application Note 2 advises that the sentencing court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake, i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement." The note cautions

11

that "the scope of the criminal activity jointly undertaken by the defendant… is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."

In assessing how much of the offense the defendant is responsible for in the jointly undertaken activity, the court must make specific factual findings as to both the scope of the agreement and the foreseeability of others' conduct. See United States v. Lacroix, 28 F.3d 223 (1st Cir. 1994)[5]; United States v. Hunter, 323 F.3d 1314 (11th Cir. 2003); see also United States v. Gallo, 195 F.3d 1278, 1280 (11th Cir. 1999). Section 1B1.3, note 2 articulates the two-pronged test assigning accountability to a defendant for the conduct of others that was both: (1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal activity. The application note further explains:

> In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).

---

[5] In United States v. Lacroix, 28 F.3d 223 (1st Cir. 1994), the defendant and others were involved in the construction and sales of a real estate development. When sales began to slacken, they conspired to defraud lenders by secretly giving money, secured by late-filed second mortgages, to any purchaser who lacked the minimum down payment to purchase a house. United States v. Lacroix, 28 F.3d 223, 225-226 (1st Cir. 1994). In holding defendant responsible under § 2F1.1 for all the losses caused by the conspiracy, the First Circuit examined the standards for determining relevant conduct under § 1B1.3(a)(1)(B). Id. at 227-228. The sentencing court must determine what acts and omissions of others were in furtherance of the defendant's jointly undertaken activity, and to what extent such acts and omissions were reasonably foreseeable to defendant. Id.

12

§ 1B1.3, note 2; see United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir. 1993) (citing U.S.S.G. § 1B1.3, cmt. (n.2)) (in determining a defendant's liability for the acts of others, "the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant."); United States v. Bush, 28 F.3d 1084, 1087 (11th Cir. 1994).[6] Only after the District Court makes individualized findings concerning the scope of criminal activity the defendant undertook, should the Court to determine reasonable foreseeability. See Bush, 28 F.3d at 1087; Studley, 47 F.3d at 574-75. Section 1B1.3, note 2, also provides guidance as to how the District Court should determine the scope of the defendant's agreement: "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."

The case at bar poses an additional issue. Various defendants involved in some transactions had nothing to do with, or did not have knowledge of, other transactions. Relevant conduct does not include holding a defendant accountable for other transactions if the defendant can only speculate that this type of transaction might be occurring elsewhere. See United States v. Laboy, 351 F.3d 578 (1st Cir. 2003) ("[M]ere knowledge of another's activity is not enough to show liability under U.S.S.G. §1B1.3, rather, 'the concept...is foreseeability.'"); see also United States v. O'Campo, 973 F.2d 1015, 1023 (1st Cir. 1992). Each defendant is responsible only for foreseeable conduct within the scope of his own explicit or implicit agreement. See, e.g., United States v. Carrozza, 4 F.3d 70, 76 (1st Cir. 1993), cert. denied, 511 U.S. 1069 (1994) ("So as to keep the criminal responsibility within

_____

[6] See also United States v. Campbell, 279 F.3d 392, 400 n.5 (6th Cir. 2002); United

bounds, §1B1.3 requires sentencing courts to ascertain on an individual basis the scope of the criminal activity that the particular defendant agreed jointly to undertake."); United States v. Innamorati, 996 F.2d 456, 488-489 (1st Cir. 1993) (each member of a drug conspiracy may be held accountable at sentencing for a different quantity of narcotics, depending on the circumstances of each defendant's involvement). While a conspiracy charge may encompass all acts by co-conspirators in furtherance of the conspiracy; see Pinkerton v. United States, 328 U.S. 640, 647 (1946); 'relevant conduct' is limited to the foreseeable acts resulting from the defendant's particular agreement. Thus, the scope of the relevant conduct is "not necessarily the same as the scope of the entire conspiracy." U.S.S.G. §1B1.3, cmt.(n.2).

    To be held accountable for transactions of others, the defendant must have made an explicit or implicit agreement with the other defendants that furthered the joint criminal activity, and the activity must have been reasonably foreseeable to him.[7] The drug case examples provided by the Guidelines are analogous to the instant offense. Street-level distributors in a large-scale drug conspiracy are accountable only for their own sales and the sales of others for which they aided and abetted and could reasonably foresee; in the case at

---

States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995) .

    [7] See United States v. Wood, 924 F.2d 399 (1st Cir. 1991) (defendant held accountable for four drug transactions; although the First Circuit agreed that three of the transactions were part of same common scheme as the count of conviction, the fourth transaction was consummated solely by the defendant's wife, defendant did not know about it until it was over, despite fact that the defendant benefited from the conduct, it was distinctly different from the crime of conviction).

bar, some defendants' involvement in certain loans make them accountable to the extent that their individual conduct aided and abetted those loans.[8]

### B.    Money Laundering

With regard to the money laundering counts, there are properties identified in those counts that are different from the properties identified in the wire fraud counts. Some defendants will be held accountable for those properties as relevant conduct to the wire fraud counts. Those losses will be included under the aggregate loss at § 2B1.1 because those properties are part of the same common scheme or plan as the wire fraud conviction.

### IV.    CONCLUSION

In conclusion, the defendants herein submit that the lending institutions are the victims of this offense. Loss assessment should be based on the actual losses to the lending institutions. To assist the court in its task, the defendants will submit a thorough and detailed

---

[8] Section 1B1.3, note 2, comment (6), provides a useful example regarding loss attribution in a jointly undertaken activity:

Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably in connection with that criminal activity.

loss exhibit researched by a highly qualified expert, an outside bank auditor. The exhibit will be reviewed and examined by the defendants as to its accuracy in reporting the facts relating to the loans. It will represent an analysis of each of the 96 properties named in the indictment and the status of those properties. Once the Court has determined the total loss involved in the 96 properties, the Court will be in a proper position to assess each defendant's liability individually. The defendants aver that loss assignment for most defendants will be different from the loss total.

WHEREFORE, based on the foregoing reasons, the defendants submit that the Court should adopt the methodology for determining loss that is espoused in this memorandum.

Respectfully submitted by:

For defendant Albert Innarelli,

Moira L. Buckley
James W. Bergenn
Shipman and Goodwin, LLP
One Constitution Plaza
Hartford, CT 06103
860-251-5836
Fax: 860-251-5219

For defendant Michael Bergdoll,

Steven W. Leary
95 State Street, Suite 309
Springfield, MA 01103
413-737-1489
Fax: 413-733-0238

16

For defendant Anthony Matos,


_____

Vincent A. Bongiorni
95 State Street
Suite 309
Springfield, MA 01103413-732-0222
Fax: 413-746-4970

For defendant Pasquale Romeo,


_____

Michael O. Jennings
73 Chestnut Street
Springfield, MA 01103
413-737-7349
Fax: 413-731-1302

For defendant Wilfred Changasie,


_____

Terry S. Nagel
95 State Street, Suite 918
Springfield, MA 01103
413-731-8811
Fax: 413-731-6641

For defendant Mark McCarthy,


_____

Robert Santaniello, Jr.
Santaniello & Santaniello
83 State Street, 3rd Floor
Springfield, MA 01103
413-781-2132
Fax: 413-732-7515

For defendant James Smith,


_____

Jack St. Clair, Esq.
73 Chestnut Street
Springfield, MA 01103
413-737-5000
Fax: 413-731-1302

For defendant Lawrence Lynch,


_____

Kevin G. Murphy
Pessolano, Dusel, Murphy & Casartello, PC
115 State Street, 5th Floor
Springfield, MA 01103
413-781-4700
Fax: 413-781-0471

18

The Defendant,
Joseph Sullivan
By His Attorney.

Thomas A. Kokonowski, Esq.
101 State St. Suite 715
Springfield, MA 01103
413-737-9700
BBO#564549.

## **CERTIFICATION**

I hereby certify that the foregoing memorandum of law was filed electronically on this 28th day of July, 2006, and was sent via regular mail on this same date to the following parties:

Steven W. Leary, Esq.
95 State Street, Suite 309
Springfield, MA 01103
413-737-1489
Fax: 413-733-0238

Vincent A. Bongiorni, Esq.
95 State Street, Suite 309
Springfield, MA 01103
413-732-0222
Fax: 413-746-4970

Michael O. Jennings, Esq.
73 Chestnut Street
Springfield, MA 01103
413-737-7349
Fax: 413-731-1302

Terry S. Nagel, Esq.
95 State Street, Suite 918
Springfield, MA 01103
413-731-8811
Fax: 413-731-6641

William H. Kettlewell, Esq.
Maria Durant, Esq.
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
617-371-1005
Fax: 617-371-1037

Robert Santaniello, Jr., Esq.
Santaniello & Santaniello
83 State Street, 3rd Floor
Springfield, MA 01103
413-781-2132
Fax: 413-732-7515

Jack St. Clair, Esq.
73 Chestnut Street
Springfield, MA 01103
413-737-5000
Fax: 413-731-1302

Mark J. Albano, Esq.
Dalsey, Ferrara & Albano
73 State Street, Suite 101
Springfield, MA 01103
413-736-6971
Fax: 413-746-9224

Thomas A. Kokonowski, Esq.
Antonucci & Associates
Stockbridge Street
Springfield, MA 01103
413-737-9700
Fax: 413-732-3132

Kevin G. Murphy, Esq.
Pessolano, Dusel, Murphy & Casartello, PC
115 State Street, 5th Floor
Springfield, MA 01103
413-781-4700
Fax: 413-781-0471

Peter M. Murphy, Esq.
101 State Street, Suite 715
Springfield, MA 01103
413-733-1222
Fax: 413-733-1245

Gary A. Ensor, Esq.
34 Bridge Street
South Hadley, MA 01075
413-315-6152
Fax: 413-315-6153

William M. Welch, II
U.S. Attorney's Office
Suite 310
1550 Main Street
Springfield, MA 01103
413-785-0237
Fax: 413-785-0394

Moira L. Buckley

21