UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA : 
  Plaintiff :
:
v. : CRIMINAL NO: 04-30046-04 MAP
:
PASQUALE ROMEO :
  Defendant :

# DEFENDANT'S SENTENCING MEMORANDUM
# AND
# MOTION FOR DOWNWARD DEPARTURE

Pasquale Romeo appeared before Your Honor on May 4, 2006, and pleaded guilty to three counts of Wire Fraud in violation of Title 18 U.S.C. §1343 and one count of Conspiracy to Launder Money in violation of Title 18 U.S.C. § 1956 and 1957. While there is a plea agreement in this case, there is no agreement on guideline calculations or factors that may warrant a departure.

## Guideline Calculations

It is now settled law pursuant to *United States v Booker,* 125 S.Ct. 738 (2005), that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements. In that regard, the Sentencing Commission has provided guidance in determining when there may be factors that mitigate the presumptive guideline range.

Using the Court's method of finding loss, Romeo submits that he is accountable for loss between $400,000 and $1 million. [The pre sentence report holds Romeo accountable for loss of $1,127,599 using the Court's methodology. The report does not particularize how that figure is arrived at and defendant cannot check the calculation. Because the total is so close to the last level down on the loss table and because he takes

1

issue with some of the loss being attributed to him the defendant requests that the precise factual data in support of the figure be revealed. It is his position that the loss is less than $1,000,000.]

Romeo is accountable for 28 properties in the indictment. He received no benefit from any more than 28 properties, whether the government is considering all 101 or the 296 it brought into the offense conduct as relevant conduct. In the 28 properties, there were but seven lending institution victims. There is no evidence the defendant supervised or had any control over any member of the conspiracy in the fraud offense, but more importantly in the monetary transaction offense. Nor is there any evidence that he personally derived $1 million. The defendant submits that using the Court's methodology on loss, the Total Offense level is 18, CHC I for a guideline range of 27 – 33 months.

## Guideline Factors that May Warrant a Departure

In the event the Court finds that Romeo is accountable for all 101 properties, then the defendant believes that there are good reasons to find that an encouraged departure at §2B1.1(n.18(C)) when the offense level overstates the seriousness of the offense applies to Romeo's offense. For instance, holding Romeo accountable for 101 properties will also increase some of the specific offense characteristics. In that event, the defendant asks the court to consider a departure. Where enhancements are sufficiently distinct to escape the vice of double counting, but nonetheless substantially overlap (such as number of properties and number of victims), the overlap can over-punish defendants in a manner and degree not contemplated by the Sentencing Commission. See U.S. v Jackson, 346 F.3d 22 (2d Cir. 2003); U.S. v

Lauerson, 348 F.3d 329 (2d Cir. 2003), *adhered to on rehearing,* 362 F.3d 160 (2d Cir. 2004).  *See also* U.S. v Kostakis, 364 F.3d 45 (2d Cir. 2004).

Moreover, Romeo has a compromised physical condition.  His overweight condition is due in most part by his inability to walk any distance.   This inability is the result of a back injury he suffered while working at construction site.  While his doctor says that Romeo does not require any special care, the fact is that he has had major heart surgery, has hypertension, a prostate condition that cannot be operated on because of the heart condition.  With a father who died at age 71 from a heart attack, it is likely that the defendant's own heart condition will shorten his life as well.

U.S.S.G. 5H1.1 states:  "Age is not ordinarily relevant in determining whether a departure is warranted.  Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.  Physical condition, which may be related to age, is addressed at § 5H1.4."  Section 5H1.4 states, in part:  "Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted.  However, an extraordinary physical impairment may be a reason to depart downward: e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

*Booker* requires that in addition to considering the now advisory guideline calculation, the sentencing court is mandated to consider the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the

3

offense and the history and characteristics of the defendant. As both these factors are, in this case, intricately intertwined, we address them as together.

## History and Characteristics of the Defendant and

## Nature and Circumstances of the Offense

Pasquale Romeo has been involved in real estate most of his life. His parents owned several rental properties in Springfield and he started learning about the management and maintenance of those properties starting at the age of 16. Indeed some of the properties named in the indictment were properties he and his wife inherited from his mother. (*In his objections to the pre-sentence report and the government's version the defendant argues that these and other properties cannot be included in the scheme alleged in the indictment to which he has admitted participating. These properties were not flipped and were not obtained by Romeo with any fraudulent intent. They were held and managed by him as rental properties for many years).* Many of the properties were in the same neighborhood the defendant was born and raised in. In fact, he has lived in that same neighborhood for all 67 years of his life. On only three different streets all within less than a mile of each other. Still does. He currently lives with his wife of 45 years at 89 Hall St. They have lived in that house for over 35 years, raised their children there and sent them to the same public schools he went to.

It is a different neighborhood than what it used to be although it had long been a working class one with parts of it more run down than others. It is full of multiple family dwellings and at the time of the defendant's youth were lived in by families who worked at the many skilled or unskilled labor type manufacturing companies that abandoned this city over the past 35-40 years. Many of the homes have been distressed but habitable for

4

50 years or more. The author of this paper knows. Counsel grew up within a mile or so of these streets, went to the same schools and has family still living in the home he grew up in. (Unlike the defendant, however, counsel left.)

These same streets are now riddled with crime and violence and many of the people who live there have not obtained the work skills to compete for the ever-dwindling pool of decent jobs that are available. Most of the second or third generations of families that used to inhabit this neighborhood have left. They relocated to Longmeadow, East Longmeadow, Wilbraham, Hampden, Agawam, Southwick or the towns in Hampshire County. Not Pat Romeo. He still calls home the same half-mile radius he has lived in all of his life. He has attended Holy Name Church all of his life. Still does. He and his wife sit in the same pew week after week. He was baptized, received First Communion, Confirmed and married there as were all of his children.

He drives past Kensington Avenue School and Forest Park Junior High School every day. He went to both of them before dropping out of high school in the 10th grade. He drives by all of the houses his parents owned. Some on the same street he lives on. He drives by some of the houses named in the indictment which are located in his neighborhood. He has owned rental properties with his wife in that neighborhood for years, like his parents did. They have owned 15-20 at any given time providing places for people to live. They have taken reasonably good care of these many deteriorating properties while collecting or trying to collect modest rents from the often short-term tenants. (Some of the longer term ones have written letters of support on his behalf.) He has always complied with Housing Court directives. He has a cooperative reputation there.

He has done much to continue to be a neighbor to those who live near him. Reference is made to the "Offender Characteristics" section of the pre-sentence report and to the letters of support provided to the Court. It is fair to conclude from a review of them that Mr. Romeo has long been a generous and involved member of this neighborhood through its years of change. These letters do not come from the exalted but from neighbors, friends, family and people he has helped. Most of them from that same neighborhood. The ones who know him best. Despite the fact that he may be "streetwise" having come from this humble neighborhood, there is a consistent theme that he is a man who likes to help and who has showed much kindness and compassion to others. Most of it right there where he has faithfully remained a son of this city.

In the housing market Mr. Romeo has been involved in most of his life, one is always looking to buy somewhat distressed properties at low prices, fix them up in a basic way and sell them for a profit or hold on to them as rental property. Often, these properties are found at foreclosure type auctions. That is where the defendant Romeo met his co-defendants in the late 90's. He did not know them prior to this with the exception of one or two including Mr. Innarelli and Mr. Murty. The same lawyer always represented Romeo in all of his real estate matters including the ones for which he is about to be punished. It was the same well-known and respected real estate lawyer for years. At times, Mr. Innarelli would represent another party or lender. He never represented Mr. Romeo. He also knew one of the codefendant mortgage brokers having obtained financing himself through him. That was Mr. Lynch. He did not know any of the others.

As they began to see each other at the auctions it was determined it made some sense to invest together in the properties. It was as a result of these developing relationships, as well as his own experience, that Mr. Romeo became more familiar with the lenders who sought out risky opportunities with borrowers with less stable credit histories or less solid loan servicing probabilities. Indeed, many of these lenders regularly advertised "no income verification" or "no job verification" opportunities. He was introduced to mortgage brokers who had access to pools of such "buyers" and who knew what was necessary for documentation to satisfy these eager lenders. These loans were moneymakers for the lenders even with the substantial risk. The real estate market in Springfield was also heating up at the time.

Mr. Romeo had a long time relationship with a real estate broker named Lester Premo. Mr. Premo had access to "buyers" who were looking for opportunities to buy or who were interested in participating in a closing where a buyer actually got cash paid to them. Premo was a willing and enthusiastic participant who after retiring to Atlanta later described his relationship to the scheme to federal agents who threatened to prosecute him. He was not, as the government likes to postulate or the probation department has concluded, controlled or under the direction or management of Romeo. There does not appear to be any evidence that he himself ever said so. Premo had a role. No one had to tell him how to play it. He had been in the real estate business for a long time. It had been his career. Mr. Romeo controlled no one in the scheme. He had no position of authority. Each was on his/her own and participated as he/she chose. Each had a skill or knowledge or the money to invest. There was no hierarchy. It is all set out in the government's

7

description of each individual's role and any conclusion to the contrary is not supported therein.

No evidence has been introduced to support the guideline 2 level "Role Adjustment" increase suggested for Mr. Romeo. The author of the pre-sentence report justifies it by concluding that Mr. Romeo "…managed and supervised at a minimum, several "runners" to expand his involvement in the criminal activity". Who are they? What is this conclusion based on? Even if there were so called "runners" what evidence is there that Mr. Romeo "managed and supervised" them as opposed to having, with them, taken advantage of the business they developed? It is not supported by any evidence. It does not even appear to in any way be supported in the government's version. Where does this come from?

Mr. Romeo alleges he always sold a house that was habitable or involved returning money at the closing for repairs. The exception was 59-61 Avon Place. Half of it was uninhabitable. It was not purchased by a prospective homeowner however, but by a coconspirator, Mr. Murty. He and his mother received substantial money back at the closing. The government alleges in its version less than $7,000 through his mother. It apparently chose to ignore the additional $7,000 its own chart shows was paid to one "Connie" Murty. Presumably that $14,000 was for repairs. There is no evidence Mr. Murty made them.

Mr. Romeo acknowledges that some of the properties he only invested in may have been in bad shape. He would not know. All he did was invest. He never saw the inside of those properties, rarely the outside and didn't know anything about the buyers. The properties in the money laundering conspiracy were such properties. He invested and

8

therefore got a check. He was not familiar with the details of either the property or the buyer. In the words of the government's star witnesses, Beals and Petropolous, this was a "loose partnership". It was all on a deal by deal basis.

Many of the deals Mr. Romeo was a principal in (the wire fraud counts) involved "buyers" such as Murty, Santamaria, Carr or Corona. All of them knowledgeable about the scheme and willing participants in it for profit. The rest involved buyers who either still own the house, sold it at a profit, refinanced it or some who lost it to foreclosure. There is no pattern of vulnerable victim within the Romeo mail fraud counts. These are the deals with which Romeo had knowledge of the details. He knew the house and knew who the buyer was. No "buyer-victim" has stepped forward to criticize Mr. Romeo. It does not appear there is even any anecdotal evidence in the government's version about him selling an uninhabitable house to a naïve buyer or trying to dupe any such buyer into purchasing such a property. Any buyer would have known he/she was participating in a fraudulent loan.

There is no evidence supporting the 4 level increase for more than 50 victims. Mr. Romeo dealt with less than 10 lending institutions (7) and there is no evidence any of his buyers were "victimized". It is totally unsupportable to say that "…240 individual buyers suffered a loss due to the conspirators' actions." A very large number suffered no loss. Some few victims have alleged that they lost the properties because they could not afford the mortgage payments. Why wouldn't they have known this when they signed up to make those payments? If one assumes for argument that all of the loan information was accurate, the payments would have been the same. Certainly one can't assume that the majority of the buyers were duped into thinking they could afford more than they knew

or should have known they could afford. Most either didn't care because they were willing participants or they chose to ignore their own financial limits. Why must it be assumed that their inability to service the mortgage and any resultant loss is attributable to them all being "duped"?

One woman who authored a victim/impact statement refinanced the property some years later and discharged the original fraudulently obtained mortgage. She must have been found qualified by the new lending company. They lent her over $100,000. It is assumed she did not defraud that lender. She now claims she must sell the home because she cannot make the payments. How is this the defendant's fault? She knew her financial situation when she refinanced as well as when she made the original purchase. This is another example of things simply being stated in the government's version or the pre sentence report and being suggested as fact without any support. At any rate, the defendant Romeo is unaware of any complaint by any "buyer-victim" directly against him.

At some point in early 2001 the defendant Romeo began to step away from his relationship with his codefendants. It ended completely before the searches that gave rise to the investigation and indictment that followed. Much of that decision was premised on the information that the defendant was beginning to collect about uninhabitable houses that others were dealing in. [It appears from records in the Registry of Deeds that the co conspirators Beals and Petropolous have continued in the real estate business. Perhaps legitimately and not with each other. From discovery provided, they appear to be the originators of the fraudulent elements of the scheme. As the court knows, one has pled to

a victimless tax misdemeanor and one has yet to be prosecuted despite his significant criminal record.]

### Meeting the Purposes of this Sentence

As Pasquale Romeo stands now before the Court, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Clearly, Romeo's offense is a serious one that deserves a sentence that does not minimize the gravity of the act.  Nonetheless, a just punishment for the offense need not comply with the advisory guideline range in order to meet the purpose.  The Court may also consider the mitigating factors described above and mete out a sentence that addresses those factors as well as the offense. It is argued that the government's version unfairly paints Mr. Romeo with more responsibility for the consequences of this scheme than the evidence suggests he deserves. In fact, the details of the evidence point to the contrary.

Romeo cannot be said to be a danger to the public.  There is no prior criminal behavior.  Romeo has been a law-abiding citizen for all of his 67 years, save for this offense.  He lives very modestly in the same home he and his wife moved into 35 years ago.

All things considered, a sentence that provides some punishment but does not become a life sentence for this 67 year-old man with a compromised physical condition should be sufficient to meet the purposes of sentencing. A long period of home confinement and community service would suffice to meet the ends of justice and would go a long way to ensure that restitution is paid. If the Court concludes that incarceration is required, it is respectfully suggested that a period less than the advisory guideline recommends would meet the requirement of punishment that is "sufficient but not greater than necessary".

        Respectfully submitted,
        THE DEFENDANT, PASQUALE ROMEO
        By His Attorney


        /s/ Michael O. Jennings
        Michael O. Jennings, Esq.
        73 Chestnut Street
        Springfield, MA 01103
        (413) 737-7349
        (413) 731-1302 – fax